**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA  : Hon. Jerome B. Simandle

    v.      : Crim. No. 05 - 698 - JBS

ROBERT P. GORDON,   : 18 U.S.C. § 371
JOSEPH F. MORGAN,   : 18 U.S.C § 1956(h)
BERNARD DEUTSCH,   : 18 U.S.C. § 982(a)(1)
THOMAS H. KING, and   :
ROBERT POZNER    :
         :
   Defendants.   :

**I N D I C T M E N T**

The Grand Jury in and for the District of New Jersey, sitting at Camden, charges:

**COUNT 1**

**CONSPIRACY TO COMMIT SECURITIES AND WIRE FRAUD**

At all times relevant to this Indictment:

**Background**

1. The Securities and Exchange Commission: The Securities and Exchange Commission ("SEC") is an independent agency of the United States of America charged with enforcing the securities laws of the United States, which is designed to provide the investing public with full disclosure of all material facts regarding the offer, purchase and sale of securities.  Under the federal securities laws, public companies and their officers and principal shareholders are required to file disclosure documents with the SEC to provide prospective investors with details concerning the nature of the investment and the backgrounds of various persons involved with the investment's

promotion and offering, among other information, which investors would generally
consider material to their investment decision.

2.    National Association of Securities Dealers ("NASD"): The National Association
of Securities Dealers ("NASD") is a private self-regulatory industry association charged
with enforcing the rules of fair practice in the offer, purchase, and sale of securities.

3.    Over the Counter Electronic Bulletin Board System ("OTC Bulletin Board"):
The Over the Counter Electronic Bulletin Board System ("OTC Bulletin Board") is a
regulated quotation service, maintained by the NASD, that displayed real-time quotes,
last-sale prices, and volume information in over-the-counter securities.

4.    Free-Trading Stock:  Under the federal securities laws, stock that is
unrestricted is free-trading and can be sold at any time in the public marketplace.  On
the other hand, stock that is acquired in unregistered, private sales from the issuer or
from an affiliate of the issuer, is restricted and therefore is not free-trading.  The federal
securities laws prohibited companies from issuing free-trading shares of stock, unless
such companies filed a registration statement with the SEC.  However, if such company
filed a Form S-8 Registration Statement with the SEC, it would be entitled to issue free-
trading stock, but only for *bona fide* services rendered by employees, consultants, or
advisers, and such services could not be in connection with the offer or sale of
securities in a capital-raising transaction.

5.    Nominee: The term nominee means an individual or entity whose identity is
utilized to conceal or disguise the identity of another.

6.    Market Support: The term market support includes, among other things, pre-arranged purchasing of stock shares at or about a particular price level for the purpose of setting and maintaining a market price for those shares.

## The Subject Stocks

### TeleServices Internet Group, Inc. and its Predecessors

7.    In or about November 1992, Visitors Services, Inc. ("VSI") was a Florida-based, privately-held corporation. VSI purportedly provided reservations and information services to convention and other event organizers.

8.    In or about September 1996, VSI and a dormant publicly-traded company, Dynasty Capital Corporation ("Dynasty"), underwent a reverse merger. Afterward, Dynasty was the surviving company name.

a.    Shortly thereafter, in or about October 1996, Dynasty changed its name to Visitors Services International Corp. ("VSIC").

b.    In or about March 1997, VSIC changed its name to TeleServices International Group, Inc. ("TSIGroup").

c.    In or about July 1999, the corporate name was changed to TeleServices Internet Group Inc., also known as TSIG.com. (VSIC, TSIGroup, and TeleServices Internet Group, Inc. are collectively referred to herein as "TSIG.")

9.    From at least in or about 1996 through at least in or about September 2000, the common stock ("stock") of TSIG, which traded under the symbols TIGI and TSIG, was publicly-traded on the OTC Bulletin Board.

-3-

Phoenix Information Systems, Inc.

10.    Phoenix Information Systems, Inc. ("Phoenix"), formerly known as C.S. Primo and Dynasty Travel, purportedly operated an airline reservation system based in China. The company began trading on the OTC Bulletin Board in or about the early 1990's. In or about December 1997, Phoenix filed for federal bankruptcy protection.

## The Defendants

ROBERT P. GORDON

11.    Defendant ROBERT P. GORDON was a resident of the state of Florida. Defendant ROBERT P. GORDON founded VSI in 1992. Defendant ROBERT P. GORDON and his family members owned 100% of VSI's stock, prior to its 1996 reverse merger with Dynasty. After the reverse merger, defendant ROBERT P. GORDON was the majority shareholder of TSIG and served as the company's chief executive officer, chief financial and accounting officer, chairman, and director. Defendant ROBERT P. GORDON was also the founder and chairman of Phoenix.

JOSEPH F. MORGAN

12.    Defendant JOSEPH F. MORGAN was a resident of the state of Florida and elsewhere. During at least in or about 1997, defendant JOSEPH F. MORGAN served as TSIG's independent auditor. From at least in or about 1999 to in or about 2000, defendant JOSEPH F. MORGAN performed capital raising activities for TSIG.

13.    Morgan, Ltd. is the name on an AmSouth bank account (Account No. 7966309522) on which defendant JOSEPH F. MORGAN was an authorized signer.

14.    G.M. was defendant JOSEPH F. MORGAN's daughter.

BERNARD DEUTSCH

15.    Defendant BERNARD DEUTSCH was a resident of the state of New York and was married to S.D., nee S.L. From at least in or about 1997 to in or about 2001, defendant BERNARD DEUTSCH performed capital raising activities for TSIG.

16.    Defendant BERNARD DEUTSCH was the president and chairman of an entity called Lexus Partners, Ltd. with offices in the state of New York. S.D. was the treasurer of Lexus Partners, Ltd. Defendant BERNARD DEUTSCH and S.D. were the only signatories on checking account number 0760075247 in the name Lexus Partners, Ltd. maintained at Republican National Bank.

17.    Basic Investments, Ltd. was an entity controlled by defendant BERNARD DEUTSCH, which purportedly maintained its offices in Brooklyn, New York. Defendant BERNARD DEUTSCH's wife, S.D., was purportedly an executive of the company.

18.    IRA Group, Inc. was an entity controlled by defendant BERNARD DEUTSCH, which purportedly maintained its offices in Brooklyn, New York. Defendant BERNARD DEUTSCH's wife, S.D., was purportedly a representative of the company.

THOMAS H. KING

19.    Defendant THOMAS H. KING resided in the state of New Jersey and was licensed to sell securities by the NASD. From in or about 1996 to in or about 2001, defendant THOMAS H. KING was employed at various securities brokerage firms, including but not limited to, DiMedio Kirchhoff & Co., Inc. ("DiMedio Kirchhoff & Co.") and Grady and Hatch & Company, Inc.

20.    From at least as early as in or about October 1997 to in or about November 1997, defendant THOMAS H. KING was the broker on a stock brokerage account

-5-

maintained at DiMedio Kirchhoff & Co. (Account No. 662-10630) in the name of Visitors

Services International Corp. That account was controlled by defendant ROBERT P.

GORDON.

## ROBERT POZNER

21.     Defendant ROBERT POZNER was a resident of the state of New Jersey and

was licensed to sell securities by the NASD. From in or about 1995 to in or about 2002,

defendant ROBERT POZNER was employed at various securities brokerage firms,

including Investors Associates, Inc. and Glenn Michael Financial, Inc.

## Other Individuals and Entities

### Co-conspirator 1/DiMedio Kirchhoff & Co./The Kirchhoff Organization

22.     Co-conspirator 1 ("CW1") was a resident of the state of New Jersey and was

licensed to sell securities by the NASD. From in or about 1995 to in or about 1998,

CW1 was a principal of, and owned, controlled and directed the actions of, DiMedio

Kirchhoff & Co. CW1 was also an employee of The Kirchhoff Organization, Ltd. ("The

Kirchhoff Organization"), both of which were securities brokerage firms registered under

the Securities & Exchange Act of 1934 with offices located in the state of New Jersey.

### Co-conspirator 2/Union Securities, Ltd.

23.     Co-conspirator 2 ("CW2") was a citizen and resident of Canada. From in or

about 1994 to in or about March 1997, CW2 was a broker's assistant at Global

Securities, a brokerage firm located in Vancouver, British Columbia, Canada.

Thereafter and through the relevant time period of this Indictment, CW2 worked as a

stock broker at Union Securities, Ltd. ("Union Securities"), a brokerage firm with offices

in Vancouver, British Columbia, Canada, which was engaged primarily in buying and

-6-

selling of securities for the accounts of its customers, among other financial services. As described below, with the assistance of CW2, the co-conspirators utilized Union Securities as a conduit for their nominee stock brokerage accounts.

Co-conspirator 3/Denver Attorney Trust Account

24. Co-conspirator 3 ("CW3") was a securities attorney with law offices in Denver, Colorado ("the Denver Law Firm"). CW3 was a name partner in the Denver Law Firm and served as corporate counsel for TSIG.

25. In connection with legal representation, Colorado Rules of Professional Conduct required that an attorney segregate client funds in a separate account, typically referred to as an attorney trust account, maintained in the state where the attorney's office was situated, or elsewhere with the consent of the client. CW3 maintained an attorney trust account at Wells Fargo Bank in Denver, Colorado ("the Denver Attorney Trust Account"). CW3 was an authorized signatory on that account. Pacific International Securities, Inc.

26. Pacific International Securities, Inc. ("Pacific International Securities") was a stock brokerage firm with offices in Vancouver, British Columbia, Canada, engaged primarily in buying and selling of securities for the accounts of its customers, among other financial services.

-7-

Canadian Nominee Stock Brokerage Accounts

27.     Defendant ROBERT P. GORDON and CW3 created, and caused to be created, the following offshore entities organized under the laws of the Cayman Islands, British West Indies: Option Consulting Co. ("Option Consulting"); TransNational Properties, Inc. ("TransNational Properties"); and Financial Consultants, Inc. ("Financial Consultants"). Thereafter, defendant ROBERT P. GORDON and CW3 caused stock brokerage accounts to be opened at Union Securities in Canada in the same entity names. Those accounts were controlled by defendant ROBERT P. GORDON and CW3. The following account numbers were associated with those entities:

        a.     Option Consulting Co. – account #023-533U-0;

        b.     TransNational Properties – account #027-715U-1; and

        c.     Financial Consultants – account #017-197U-9.

28.     Defendant ROBERT P. GORDON and CW3 also controlled an offshore stock brokerage account (account #018-225U-3) at Union Securities in the name D.C.F.H.. D.C.F.H. was a citizen and resident of Taipei, Taiwan, Republic of China.

29.     Defendant JOSEPH F. MORGAN and CW3 created, and caused to be created, an offshore entity called Titan Gulf Partnership, Ltd. ("Titan Gulf"), organized under the laws of the Cayman Islands, British West Indies. Thereafter, defendant JOSEPH F. MORGAN and CW3 caused a stock brokerage account to be opened at Union Securities in Canada in the name Titan Gulf. That account, #027-344U-0, was controlled by defendant JOSEPH F. MORGAN and CW3.

30.     With the assistance of CW3, defendant THOMAS H. KING and CW1 opened, and caused to be opened, a stock brokerage account at Pacific International

-8-

Securities in Canada, under the name TransOrient Resources, Ltd. ("TransOrient Resources"). That account was under the control of at least defendant THOMAS H. KING and CW1.

31.     South Shore Marketing, Inc. ("South Shore Marketing") was the name on a stock brokerage account, account #026-541U-3, maintained at Union Securities. With the assistance of CW3, CW1 set up the South Shore Marketing stock brokerage account in Canada listing CW1's wife as the entity's only officer. CW1 maintained control over the South Shore Marketing stock brokerage account through a power of attorney document executed by CW1's wife.

### The Conspiracy

32.     From at least as early as in or about December 1996 to at least on or about October 27, 2000, in the District of New Jersey and elsewhere, defendants

**ROBERT P. GORDON,**
**JOSEPH F. MORGAN,**
**BERNARD DEUTSCH,**
**THOMAS H. KING,**
**and**
**ROBERT POZNER**

did knowingly and willfully combine, conspire, confederate and agree with each other and with others, to commit certain offenses against the United States, namely, (i) securities fraud, contrary to Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; and (ii) wire fraud, contrary to Title 18, United States Code, Section 1343.

-9-

### The Objects of the Conspiracy

#### A. Securities Fraud

33.    It was an object of the conspiracy that defendants ROBERT P. GORDON,
JOSEPH F. MORGAN, BERNARD DEUTSCH, THOMAS H. KING, and ROBERT
POZNER, and others, by the use of the means and instrumentalities of interstate
commerce, and of the facilities of a national securities exchange, knowingly and willfully
would and did use and employ, in connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances contrary to Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and
artifices to defraud; (b) making untrue statements of material facts and omitting material
facts necessary in order to make the statements made, in the light of the circumstances
under they were made, not misleading; and (c) engaging in acts, practices, and courses
of business that operated as a fraud and deceit upon a person, in connection with the
purchase and sale of securities of TSIG and Phoenix, contrary to Title 15, United States
Code, Sections 78j(b) and 78ff(a).

34.    It was part of the conspiracy that defendants ROBERT P. GORDON,
JOSEPH F. MORGAN, and THOMAS H. KING, and others, acquired ownership and
control of a substantial number of TSIG stock shares, which ownership and control
were not disclosed to the public.

35.    It was further part of the conspiracy that defendant ROBERT P. GORDON
and CW3 and others, paid, and caused to be paid, substantial undisclosed
compensation, in the form of cash and free-trading TSIG stock, to defendant THOMAS
H. KING and CW1 for purchasing TSIG stock in their retail customers' accounts.

36.     It was further part of the conspiracy that, during in or about 1997, defendants ROBERT P. GORDON and ROBERT POZNER, CW1, and others pre-arranged multiple sales and unauthorized purchases of TSIG stock shares for market support, to raise capital for TSIG, and for other purposes.

37.     It was further part of the conspiracy that, from in or about October 1997 to in or about November 1997, defendants ROBERT P. GORDON and THOMAS H. KING and CW1 established a special brokerage account at DiMedio Kirchhoff & Co.  These defendants used this account exclusively to execute a  predetermined sale and corresponding unauthorized purchases of Phoenix stock shares in retail customer accounts in order to raise capital for TSIG and for other purposes.

38.     It was further part of the conspiracy that, from at least as early as in or about 1997 to at least in or about 1999, defendants ROBERT P. GORDON and BERNARD DEUTSCH received proceeds from the sale of free-trading TSIG stock shares that were initially provided to defendant BERNARD DEUTSCH's nominees in exchange for defendant BERNARD DEUTSCH's capital raising and other promotional activities.

39.     It was further part of the conspiracy that, at least as early as in or about August 1999, defendants ROBERT P. GORDON and JOSEPH F. MORGAN agreed that defendant JOSEPH F. MORGAN would promote TSIG stock in exchange for free-trading TSIG stock shares.  Thereafter, defendant JOSEPH F. MORGAN used his network of promoters, brokers, and private investors to buy TSIG stock shares for market support and to otherwise artificially inflate the per share price of TSIG stock.

40.     It was further part of the conspiracy that defendants ROBERT P. GORDON, THOMAS H. KING, and JOSEPH F. MORGAN, and others, utilized offshore nominee

-11-

entities and brokerage accounts to conceal TSIG stock shares which they secretly controlled. Those TSIG stock shares were then sold to public investors thereby generating substantial profits. Those profits were often repatriated using the Denver Attorney Trust Account and divided amongst the defendants and others.

## B. Wire Fraud

41.     It was further an object of the conspiracy that defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, THOMAS H. KING, and ROBERT POZNER, and others, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme and artifice, among other things, to arrange predetermined sales and unauthorized purchases in retail customer accounts and to secretly obtain control over free-trading TSIG stock shares and sell them to public investors, knowingly and willfully would and did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, and sounds for the purpose of executing such scheme and artifice, contrary to Title 18, United States Code, Section 1343.

## The Means and Methods of the Conspiracy

42.     Defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, THOMAS H. KING, and ROBERT POZNER, and others, including but not limited to CW1, CW2, and CW3, sought to achieve the above objects of the conspiracy by one or more of the following manner and means, among others:

a.      agreeing to make, and causing to be made, secret payments of cash and free-trading stock to securities brokers and promoters as inducements to purchase, and

-12-

Case 1:05-cr-00698-JBS Document 1 Filed 09/28/05 Page 13 of 37 PageID: 13

cause others to purchase, stock on behalf of retail customers and for capital raising and market support activities;

b. pre-arranging trades to give the appearance of legitimate transactions and concealing the false nature of those transactions;

c. utilizing various methods to conceal ownership, control, influence and proceeds from the sale of stock, including the use of nominees and offshore stock brokerage accounts held in the names of foreign entities; and

d. using facilities of interstate commerce, including the use of interstate telephone calls and wire transfers, in furtherance of the objects of the conspiracy.

### Overt Acts

In furtherance of said conspiracy and to effect the objects thereof, defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, THOMAS H. KING, and ROBERT POZNER, and others, committed the following overt acts in the District of New Jersey and elsewhere:

Unauthorized Purchases/Forgiveness of Debt - CW1, et al.

43.     In or about December 1996, defendant ROBERT P. GORDON and CW1 had a conversation during which they agreed that, if CW1 purchased 500,000 shares of TSIG stock on behalf of CW1's retail customers, CW1's $100,000 debt to defendant ROBERT P. GORDON would be forgiven.

44.     On or about April 15, 1997, CW1 purchased 100,000 shares of TSIG stock at $3.00 per share on behalf of CW1's retail customer, MML, without MML's consent or authorization.

-13-

45.     On or about April 30, 1997, CW1 purchased 50,000 shares of TSIG stock at $2.875 per share on behalf of CW1's retail customer, RL, without RL's consent or authorization.

46.     On or about May 6, 1997, CW1 purchased 75,000 shares of TSIG stock at $2.875 per share on behalf of CW1's retail customer, ML, without ML's consent or authorization.

Unauthorized Purchases/Market Support - CW1, et al.

47.     In or about April 1997, with the assistance of CW3, CW1 established a stock brokerage account at Union Securities, Vancouver, British Columbia, Canada, in the nominee name South Shore Marketing.

48.     In or about May or June 1997, defendant ROBERT P. GORDON, CW1, and CW3 had a conversation during which they agreed that CW1 would continue to purchase TSIG stock on behalf of CW1's retail customers and, in return, CW1 would receive free-trading shares of TSIG stock.

49.     On or about July 29, 1997, in exchange for CW1's purchases of TSIG stock in his retail customers' accounts, defendant ROBERT P. GORDON issued, and caused to be issued, 150,000 free-trading shares of TSIG stock to CW1's nominee, South Shore Marketing.  On or about that same date, CW3 deposited, and caused to be deposited, those 150,000 TSIG stock shares into CW1's South Shore Marketing stock brokerage account at Union Securities in Canada.

50.     On or about August 6, 1997, CW1 purchased 1,000 shares of TSIG stock at $2.25 per share on behalf of CW1's retail customer, LH, without LH's consent or authorization.

-14-

51.     On or about September 4, 1997, in exchange for CW1's purchases of TSIG stock in his retail customers' accounts, defendant ROBERT P. GORDON issued, and caused to be issued, 125,000 free-trading shares of TSIG stock to CW1's nominee, South Shore Marketing.   On or about that same date, CW3 deposited, and caused to be deposited, those 125,000 TSIG stock shares into CW1's South Shore Marketing stock brokerage account at Union Securities in Canada.

52.     On or about October 21, 1997, CW1 purchased 34,000 shares of TSIG stock at $1.7812 per share on behalf of CW1's retail customer, ML, without ML's consent or authorization.

53.     On or about December 3, 1997, in exchange for CW1's purchases of TSIG stock in his retail customers' accounts, defendant ROBERT P. GORDON issued, and caused to be issued, 175,000 free-trading shares of TSIG stock to CW1's nominee, South Shore Marketing. On or about that same date, CW3 deposited, and caused to be deposited, those 175,000 TSIG stock shares into CW1's South Shore Marketing stock brokerage account at Union Securities in Canada.

54.     From on or about May 12, 1997 to on or about May 8, 1998, CW1 sold nearly all of the free trading TSIG stock shares held in the South Shore Marketing account in Canada, which CW1 received from defendant ROBERT P. GORDON and CW3 for TSIG market support and other illicit activities, as described above. As a result, CW1 received TSIG stock sales proceeds of at least approximately $660,000, each sale constituting a separate overt act.

-15-

Market Support - Defendant ROBERT POZNER, et al.

55.   On or about the dates set forth below, defendant ROBERT P. GORDON,

defendant ROBERT POZNER, CW1, and others, effected the following series of wire

transactions for the purchases of TSIG stock shares for the purpose of pegging, fixing,

and stabilizing the price of TSIG stock and sale, each transaction constituting a

separate overt act, as follows:

| Overt Act | Date | Price | Number of Shares | Seller | Purchaser |
|---|---|---|---|---|---|
| a. | 05/30/97 | $2.7500 | 11,000 | Defendant POZNER | CW1 for ML |
| b. | 06/06/97 | $2.7500 | 190 | Defendant POZNER | CW1 |
| c. | 06/06/97 | $2.7500 | 5,500 | Defendant POZNER | CW1 for UD |
| d. | 06/12/97 | $2.7500 | 5,000 | Defendant POZNER | CW1 |
| e. | 06/16/97 | $2.7500 | 10,000 | Defendant POZNER | CW1 |
| f. | 06/17/97 | $2.5625 | 25,000 | Defendant POZNER | CW1 |

Phoenix Stock Cross Trade - Defendant THOMAS H. KING, et al.

56.   In or about October 1997, defendant ROBERT P. GORDON, defendant

THOMAS H. KING, and CW1 participated in an interstate telephone call during which

they agreed to arrange the sale of several hundred thousand shares of Phoenix stock

to their retail customers in order to raise capital for TSIG.

57.   In or about October 1997, defendants ROBERT P. GORDON and THOMAS

H. KING opened, and caused to be opened, a stock brokerage account in the name of

Visitors Services International Corp. at DiMedio Kirchhoff & Co.

58.   On or about October 27, 1997, defendant ROBERT P. GORDON transferred

407,525 shares of Phoenix stock into the Visitors Services International Corp. stock

brokerage account at DiMedio Kirchhoff & Co.

59.     Prior to selling all of the said 407,525 shares of Phoenix stock, defendants ROBERT P. GORDON and THOMAS H. KING, and CW1 agreed on the sale and purchase price of the shares.

60.     In or about early November 1997, without consent or authorization from their retail customers, defendant THOMAS H. KING and CW1 purchased the said 407,525 shares of Phoenix stock on behalf of their retail customers, resulting in proceeds of $188,344.60 for the benefit of defendant ROBERT P. GORDON.

61.     On or about November 6, 1997, at defendant ROBERT P. GORDON's direction, the $188,344.60 in proceeds from the sale of the said 407,525 shares of Phoenix stock were wire-transferred from the Visitors Services International Corp. stock brokerage account to a bank account maintained by Zuckerman Gore Brandeis, LLP in New York.

Bogus Agreement - Defendant JOSEPH F. MORGAN, et al.

62.     In or about August 1999, defendants ROBERT P. GORDON and JOSEPH F. MORGAN had a conversation during which they agreed that defendant JOSEPH F. MORGAN would promote TSIG stock and provide capital raising activities in exchange for free-trading TSIG stock shares.  As agreed, defendant JOSEPH F. MORGAN used his network of promoters, brokers, and private investors to buy TSIG stock shares for market support and to otherwise artificially inflate the per share price of TSIG stock.

63.     On or about August 17, 1999, TSIG entered into a bogus consulting agreement with defendant JOSEPH F. MORGAN, which purported that in exchange for "financial management services," defendant JOSEPH F. MORGAN would receive,

-17-

among other things, an option to purchase 35 million shares of TSIG stock at 10¢ per share.

Nominee Stock Transactions - IRA Group, Inc., et al

64.    During at least as early as in or about 1997, defendants ROBERT P. GORDON and BERNARD DEUTSCH agreed that defendant BERNARD DEUTSCH would provide capital raising and other promotional activities in exchange for free-trading TSIG stock shares. Additionally, defendants ROBERT P. GORDON and BERNARD DEUTSCH agreed that defendant ROBERT P. GORDON would personally receive a portion of the proceeds from the sale of free-trading TSIG stock shares held in the name of defendant BERNARD DEUTSCH's nominees.

65.    From at least on or about August 22, 1997 to at least on or about December 9, 1999, utilizing the nominee names IRA Group, Inc., S.L. (defendant BERNARD DEUTSCH's wife's maiden name), and Basic Investments, Ltd., defendant BERNARD DEUTSCH received at least approximately 36,000,000 free-trading shares of TSIG stock in exchange for capital raising and other promotional activities, each issuance constituting a separate overt act.

66.    From at least on or about October 29, 1997 to at least on or about October 27, 2000, defendant BERNARD DEUTSCH sold, and caused to be sold, a substantial portion of the above-stated TSIG shares he received in nominee names in the public marketplace reaping proceeds well in excess of $5,000,000, each sale constituting a separate overt act. For example, utilizing a stock brokerage account maintained at Lewco Securities Corporation in the nominee name Basic Investment, Ltd., on or about

October 27, 2000, defendant BERNARD DEUTSCH sold 1,000 shares of TSIG receiving $1,232.45.

67.     From at least on or about April 9, 1998 to at least on or about May 10, 1999, utilizing his nominee entities IRA Group, Inc. and Lexus Partners, Ltd., defendant BERNARD DEUTSCH provided defendant ROBERT P. GORDON with at least approximately $3,085,500 from the proceeds of the above-stated TSIG stock sales.

Nominee Stock Transactions - Pacific International Securities

68.     In or about early 1998, with the assistance of CW3, defendant THOMAS H. KING and CW1 established a stock brokerage account at Pacific International Securities, Vancouver, British Columbia, Canada, in the nominee name TransOrient Resources.

69.     In or about June 1998, CW3 deposited, and caused to be deposited, at least 500,000 free-trading shares of TSIG stock into the TransOrient Resources account, for the benefit of defendant THOMAS H. KING and CW1.

70.     In or about June 1998, defendant THOMAS H. KING, CW1, and CW3 participated in an interstate telephone call during which they discussed how and why the TransOrient Resources account was set up.  At that time, CW3 told defendant THOMAS H. KING and CW1 that the account was set up in a way to keep you out of jail.

Nominee Stock Transactions - Union Securities

71.     In or about June 1997, defendant ROBERT P. GORDON and CW3 established a stock brokerage account, and caused a stock brokerage account to be

-19-

established, at Union Securities in Canada under the nominee name D.C.F.H. ("the D.C.F.H. account").

72.    On or about June 6, 1997, 82,000 free-trading shares of TSIG stock were deposited into the D.C.F.H. account.

73.    From on or about June 9, 1997 to on or about June 12, 1997, at the direction of defendant ROBERT P. GORDON and CW3, 47,900 shares of TSIG stock were sold from the D.C.F.H. account, generating proceeds of approximately $118,466, each sale constituting a separate overt act.

74.    On or about June 12, 1997, at the direction of defendant ROBERT P. GORDON and CW3, $75,000 was wire-transferred from the D.C.F.H. account in Canada into the Denver Attorney Trust Account.

75.    On or about June 13, 1997, CW3 transferred, and caused to be transferred, by wire transmission, $75,000 from the Denver Attorney Trust Account to Barnett Bank for the benefit of defendant ROBERT P. GORDON and his wife. That amount was funded by proceeds derived from the sale of TSIG stock in the D.C.F.H. account at Union Securities.

76.    In or about June 1997, defendant ROBERT P. GORDON and CW3 established a stock brokerage account, and caused a stock brokerage account to be established, at Union Securities in Canada under the nominee name Financial Consultants ("the Financial Consultants account").

77.    In or about August 1997, defendant ROBERT P. GORDON and CW3 established a stock brokerage account, and caused a stock brokerage account to be

-20-

established, at Union Securities in Canada under the nominee name Option Consulting
("the Option Consulting account").

78.     On or about March 20, 1998, at the direction of defendant ROBERT P.
GORDON and CW3, 450,000 free-trading shares of TSIG stock were deposited into the
Option Consulting account.

79.     From on or about March 19, 1998 to on or about March 25, 1998, at the
direction of defendant ROBERT P. GORDON and CW3, approximately 385,000 shares
of TSIG stock were sold from the Option Consulting account generating proceeds of
approximately $135,761, each sale constituting a separate overt act.

80.     On or about March 25, 1998, at the direction of defendant ROBERT P.
GORDON and CW3, $135,040 was wire-transferred from the Option Consulting
account in Canada into the Denver Attorney Trust Account.

81.     On or about March 27, 1998, CW3 transferred, and caused to be transferred,
by wire transmission, $135,000 from the Denver Attorney Trust Account to Northern
Trust Bank, in Florida, for the benefit of defendant ROBERT P. GORDON.  That
amount was funded by proceeds derived from the sale of TSIG stock in the Option
Consulting account at Union Securities.

82.     In or about October 1999, defendants ROBERT P. GORDON and JOSEPH
F. MORGAN, and CW3 established a stock brokerage account, and caused a stock
brokerage account to be established, at Union Securities in Canada under the nominee
name Titan Gulf ("the Titan Gulf account").

83.     In or about August 1997, defendant ROBERT P. GORDON and CW3
established a stock brokerage account, and caused a stock brokerage account to be

established, at Union Securities, Vancouver, British Columbia, Canada, in the nominee name TransNational Properties (Account No. 027-715U-1) ("the TransNational Properties account").

84.     On or about August 3, 2000, defendant ROBERT P. GORDON issued, and caused to be issued, 450,000 shares of TSIG stock to defendant JOSEPH F. MORGAN via stock certificates.

85.     On or about August 4, 2000, CW3 sent, and caused to be sent, a letter to Union Securities directing Union Securities to hold the said TSIG stock certificates issued in defendant JOSEPH F. MORGAN's name pending further instructions from CW3's office.

86.     On or about August 6, 2000, defendant JOSEPH F. MORGAN executed, and caused to be executed, a Union Securities Third Party Release Form by which he transferred the said 450,000 shares of TSIG stock in his name to TransNational Properties and directed that said shares be deposited into the TransNational account at Union Securities.  On that document, defendant JOSEPH F. MORGAN falsely indicated that he obtained those 450,000 TSIG stock shares from the issuer pursuant to a Form S-8 Registration Statement filing.

87.     On or about August 8, 2000, the said 450,000 shares of TSIG stock were deposited into the TransNational account at Union Securities.

88.     On or about August 8, 2000, CW3, as president of TransNational Properties, executed, and caused to be executed, a Union Securities Disclosure document through which he authorized Union Securities to sell the said 450,000 shares of TSIG stock. That document falsely indicated that the 450,000 shares of TSIG stock were fully

purchased from defendant JOSEPH F. MORGAN and paid for on August 3, 2000, when, in fact, they were not paid for at all. That document also falsely indicated that CW3 was not an "affiliate" of TSIG, when in fact he was the company's corporate counsel.

89.     From on or about August 8, 2000 to on or about September 21, 2000, at CW3's direction, approximately 520,000 shares of TSIG stock were sold out of the TransNational Account at Union Securities, generating proceeds of at least approximately $700,000, each sale constituting a separate overt act.

90.     On or about August 23, 2000, CW3 executed, and caused to be executed, a Union Securities Wire Transfer Instruction Form directing that $100,000 be wire-transferred from the TransNational Properties account to the Denver Attorney Trust Account.

91.     On or about August 24, 2000, CW3 transferred, and caused to be transferred, by wire transmission, $100,000 from the Denver Attorney Trust Account to AmSouth Bank in Florida for the benefit of defendant JOSEPH F. MORGAN's nominee, Morgan, Ltd. (account #7966309522). That amount was funded by proceeds derived from sales of TSIG stock in the TransNational Properties account at Union Securities.

92.     On or about September 28, 2000, CW3 executed, and caused to be executed, a Union Securities Wire Transfer Instruction Form directing that $135,000 be wire-transferred from the TransNational Properties account in Canada to the Denver Attorney Trust Account.

93.     On or about September 29, 2000, CW3 transferred, and caused to be transferred, by wire transmission, $14,857.25 from the Denver Attorney Trust Account

to AmSouth Bank in Florida for the benefit of Morgan, Ltd. (account #7966309522), defendant JOSEPH F. MORGAN's nominee. That amount was funded by proceeds derived from sales of TSIG stock in the TransNational Properties account at Union Securities.

94.     On or about September 29, 2000, CW3 wrote, and caused to be written, check number 3363 from the Denver Attorney Trust Account in the amount of $52,629.75 payable to Sallie Mae Servicing Corporation on behalf of defendant JOSEPH F. MORGAN's daughter, G.M.  That amount was funded by proceeds derived from sales of TSIG stock in the TransNational Properties account at Union Securities.

In violation of Title 18, United States Code, Section 371.

## COUNT 2

### CONSPIRACY TO COMMIT MONEY LAUNDERING

1. The allegations contained in paragraphs 1 through 31 and 33 through 94 of Count 1 of this Indictment are repeated and realleged as if fully set forth herein.

2. From at least as early as on or about June 12, 1997 through at least on or about October 27, 2000, in the District of New Jersey and elsewhere, defendants

### ROBERT P. GORDON,
### JOSEPH F. MORGAN,
### BERNARD DEUTSCH and
### THOMAS H. KING

and others, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activitiy, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, knowingly and willfully did conspire and agree with each other and with others to conduct a financial transaction affecting interstate commerce which, in fact, involved the proceeds of specified unlawful activity, namely, securities and wire fraud, resulting in the purchase, sale, delivery, transfer, and other disposition of approximately 93,000,000 shares of TSIG stock and approximately $15,000,000 in currency from the sale of such stock shares, contrary to Title 18, United States Code, Section 1956(a)(1)(B).

### Manner and Means of the Conspiracy

3. It was part of the conspiracy that defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, and THOMAS H. KING, and CW1, CW3, and others, obtained at least approximately $15,000,000 as a result of fraudulent activities

-25-

activities with regard to the acquisition and sale of TSIG stock, as well as the disposition of those sale proceeds. Specifically: (1) defendants ROBERT P. GORDON, JOSEPH F. MORGAN, and THOMAS H. KING, and CW1, CW3, and others, acquired at least approximately 57,000,000 shares of TSIG stock through the use of nominees, held those shares in offshore brokerage accounts, and sold those shares on the OTC Bulletin Board making misrepresentations and omissions of material facts in connection with those stock acquisitions and sales; and (2) defendants ROBERT P. GORDON and BERNARD DEUTSCH, and others, acquired at least approximately 36,000,000 shares of TSIG stock through the use of nominees and sold those shares on the OTC Bulletin Board making misrepresentations and omissions of material facts in connection with those stock acquisitions and sales. The defendants utilized wire transmissions in interstate and foreign commerce in the execution of their securities fraud scheme.

4. It was further part of the conspiracy that defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH and THOMAS H. KING, and CW1, CW3, and others, took steps to conceal and disguise the nature, the location, the source, the ownership, and the control of the TSIG stock shares and the proceeds from their securities fraud and wire fraud activities, including but not limited to: (i) causing those shares and proceeds to be deposited into various stock brokerage accounts maintained in nominee names at securities brokerage firms in Canada and elsewhere; (ii) causing a large portion of the stock sales proceeds to be transferred by wire into the Denver Attorney Trust Account in Denver, Colorado; and (iii) diverting the stock sales proceeds to the personal use of defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, and THOMAS H. KING, and CW1, CW3, and others, through

-26-

wire transfers and other disbursement avenues. Some of the means and methods employed by the defendants, and others, to accomplish the aims of the conspiracy are described below.

5.     It was further part of the conspiracy that defendant ROBERT P. GORDON, CW3, and others issued, and caused to be issued, blocks of "free trading" TSIG stock shares in nominee names, including: (a) Option Consulting, TransNational Properties, Financial Consultants, and D.C.F.H., all of which were controlled by defendant ROBERT P. GORDON and CW3; (b) Titan Gulf, which was controlled by defendant ROBERT P. GORDON, CW3, and defendant JOSEPH F. MORGAN; (c) South Shore Marketing, which was controlled by CW1; (d) TransOrient Resources, which was controlled at least by defendant THOMAS H. KING and CW1; and (e) IRA Group, Inc., Lexus Partners, Ltd, Basic Investments, Ltd., and S.L., all of which were controlled by defendant BERNARD DEUTSCH. At no time were disclosures made to the SEC and public investors that the stock held in those nominee names was, in fact, owned and controlled by CW1, CW3, and defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, and THOMAS H. KING.

6.     It was further part of the conspiracy that CW1, CW3, and defendants ROBERT P. GORDON, JOSEPH F. MORGAN, and THOMAS H. KING, deposited TSIG stock shares, and caused TSIG stock shares to be deposited, into one or more of the following nominee accounts maintained at stock brokerage firms in Canada: (a) the Option Consulting account; (b) the TransNational Properties account; (c) the Financial Consultants account; (d) the Titan Gulf account; (e) the D.C.F.H. account; (f) the South Shore Marketing account; and (g) the TransOrient Resources account.

7.      It was further part of the conspiracy that CW3 and defendants ROBERT P.
GORDON and JOSEPH F. MORGAN concealed and disguised ownership and control
of at least approximately 56,000,000 free-trading shares of TSIG stock by placing those
shares in, and selling them from, Canadian brokerage accounts in the nominee names
Option Consulting, TransNational Properties, Financial Consultants, Titan Gulf, and
D.C.F.H. Most, if not all, of those TSIG stock shares were received through fraudulent
means and without proper disclosure to the SEC and prospective investors.

8.      It was further part of the conspiracy that CW1 concealed and disguised
ownership and control of at least approximately 700,000 free-trading shares of TSIG
stock by placing those shares in, and selling them from, a Canadian brokerage account
in the nominee name South Shore Marketing. Most, if not all, of those TSIG stock
shares were received through fraudulent means and without proper disclosure to the
SEC and prospective investors.

9.      It was further part of the conspiracy that CW1 and defendant THOMAS H.
KING concealed and disguised ownership and control of at least approximately 500,000
free-trading shares of TSIG stock by placing those shares in, and selling them from, a
Canadian brokerage account in the nominee name TransOrient Resources. Those
TSIG stock shares were received through fraudulent means and without proper
disclosure to the SEC and prospective investors.

10.     It was further part of the conspiracy that defendant ROBERT P. GORDON
and defendant BERNARD DEUTSCH concealed and disguised ownership and control
of at least approximately 36,000,000 free-trading shares of TSIG stock by placing those

-28-

shares in the nominee names IRA Group, Inc., Basic Investments, Ltd., and S.L., without disclosing this fact to the SEC and prospective investors.

11.    It was further part of the conspiracy that CW1, CW3, and defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, and THOMAS H. KING sought to sell, on the OTC Bulletin Board, the bulk of the TSIG stock shares held in the above-stated nominee names by making false statements and omissions of material fact, with the intent that those statements and omissions would cause the stock to trade at prices substantially higher than it would otherwise command.

12.    It was further part of the conspiracy that documents were filed with the SEC and otherwise publicly disseminated containing information to investors that the defendants knew to be false and to materially misrepresent facts with regard to TSIG stock transactions, including but not limited to:

a.    the failure to disclose the true identity of the individuals and entities owning and controlling significant amounts of TSIG stock, such as CW3 and defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, and THOMAS H. KING, and their total holdings of TSIG stock;

b.    the failure to disclose that defendant ROBERT P. GORDON and CW3 were providing free-trading TSIG stock shares to at least CW1 and defendants THOMAS H. KING, JOSEPH F. MORGAN, and BERNARD DEUTSCH, in New Jersey and elsewhere, in exchange for purchasing TSIG stock in retail customers' accounts, promotional activities, and other capital raising activities; and

c.    the failure to disclose that a series of transactions took place in New Jersey and elsewhere for the purchase and sale of TSIG stock for the purpose of pegging, fixing, and stabilizing the price of TSIG stock.

13.    It was further part of the conspiracy that CW1, CW3, and defendants ROBERT P. GORDON, JOSEPH F. MORGAN, THOMAS H. KING, and BERNARD DEUTSCH knowingly took advantage of the artificially high price of TSIG stock brought about by their fraudulent activities to realize large personal profits through the sale of that stock held in nominee names.

Option Consulting Account

14.    It was further part of the conspiracy that, from in or about August 1997 to in or about January 1999, at least approximately 4,400,000 shares of TSIG stock were deposited into the Option Consulting account in Canada.  From at least as early as on or about November 7, 1997 to at least on or about February 8, 1999, most, if not all of the TSIG stock shares held in that Canadian account were sold in the public marketplace generating proceeds of at least approximately $1,346,026.  Those proceeds were transferred, primarily by wire transmission, to the Denver Attorney Trust Account and disbursed to the benefit of CW3, defendants ROBERT P. GORDON and JOSEPH F. MORGAN, their nominees, and others.

D.C.F.H. Account

15.    It was further part of the conspiracy that, from in or about June 1997 through in or about May 1999, at least approximately 1,900,000 shares of TSIG stock were deposited into the D.C.F.H. account in Canada.  From at least as early as on or about June 9, 1997 to at least on or about June 8, 1999, most, if not all of the TSIG stock

-30-

shares held in that Canadian account were sold in the public marketplace generating proceeds of at least approximately $880,354. Those proceeds were transferred, primarily by wire transmission, to the Denver Attorney Trust Account and disbursed to the benefit of CW3, defendants ROBERT P. GORDON and JOSEPH F. MORGAN, their nominees, and others.

TransNational Properties Account

16.    It was further part of the conspiracy that, from in or about August 1997 through in or about March 1999, at least approximately 5,700,000 shares of TSIG stock were deposited into the TransNational Properties account in Canada. From at least as early as on or about July 16, 1998 to at least on or about September 29, 2000, most, if not all of the TSIG stock shares held in that Canadian account were sold in the public marketplace generating proceeds of at least approximately $2,673,301, which proceeds were transferred, primarily by wire transmission, to the Denver Attorney Trust Account and disbursed to the benefit of CW3, defendants ROBERT P. GORDON and JOSEPH F. MORGAN, their nominees, and others.

17.    It was further part of the conspiracy that, for instance, on or about September 29, 2000, CW3 transferred, and caused to be transferred, by wire, $14,857.25 from the Denver Attorney Trust Account to AmSouth Bank for the benefit of Morgan, Ltd. (account #7966309522), defendant JOSEPH F. MORGAN's nominee, which was funded by proceeds derived from sales of TSIG stock in the TransNational Properties account at Union Securities.

-31-

Financial Consulting Account

18.    It was further part of the conspiracy that, from in or about June 1997 through in or about April 2000, at least approximately 24,000,000 shares of TSIG stock were deposited into the TransNational Properties account in Canada. From at least as early as on or about June 27, 1997 to at least on or about June 20, 2000, most, if not all of the TSIG stock shares held in that Canadian account were sold in the public marketplace generating proceeds of at least approximately $5,741,817. Those proceeds were transferred, primarily by wire transmission, to the Denver Attorney Trust Account and disbursed to the benefit of CW3, defendants ROBERT P. GORDON and JOSEPH F. MORGAN, their nominees, and others.

Titan Gulf Account

19.    It was further part of the conspiracy that, from in or about October 1999 through in or about March 2000, at least approximately 20,000,000 shares of TSIG stock were deposited into the Titan Gulf  account in Canada. From at least as early as on or about October 14, 1999 to at least on or about December 21, 1999, most, if not all of the TSIG stock shares held in that Canadian account were sold in the public marketplace generating proceeds of at least approximately $727,835. Those proceeds were transferred, primarily by wire transmission, to the Denver Attorney Trust Account and disbursed to the benefit of CW3, defendant JOSEPH F. MORGAN, their nominees, and others.

South Shore Marketing Account

20.    It was further part of the conspiracy that, from on or about February 14, 1997 through on or about March 24, 1997,  CW1 received at least $40,000 in compensation

-32-

from CW3 for his participation in the TSIG securities fraud scheme. To pay CW1 that compensation, CW3 wire transferred, and caused to be wire transferred, $25,000 on or about February 14, 1997 and $15,000 on or about March 24, 1997 from the Denver Attorney Trust Account to CW1's South Shore Marketing account at Commerce Bank in New Jersey.

21.    It was further part of the conspiracy that, from in or about May 1997 through in or about May 1998, at least approximately 700,000 shares of TSIG stock was deposited into the South Shore Marketing account in Canada. During that same time period, most, if not all, of the TSIG stock shares held in that Canadian account were sold in the public marketplace generating proceeds of at least approximately $660,000 and disbursed to the benefit of CW1.

TransOrient Resources Account

22.    It was further part of the conspiracy that, during in or about 1998, at least approximately 500,000 shares of TSIG stock were deposited into the TransOrient Resources account in Canada. From in or about June 1998 to in or about February 1999, a substantial amount of the TSIG stock shares held in the TransOrient Resources account were sold in the public marketplace generating proceeds of at least approximately $25,900 and disbursed to the benefit of defendant THOMAS H. KING and CW1.

IRA Group/S.L.

23.    It was further part of the conspiracy that, from at least on or about August 22, 1997 to at least on or about December 9, 1999, utilizing the nominee names IRA Group, Inc., S.L., and Basic Investments, Ltd., defendant BERNARD DEUTSCH

-33-

received at least approximately 36,000,000 free-trading shares of TSIG stock in exchange for capital raising and other promotional activities.

24.    It was further part of the conspiracy that, from at least on or about October 29, 1997 to at least on or about October 27, 2000, defendant BERNARD DEUTSCH sold, and caused to be sold, a substantial portion of the TSIG stock shares he received in nominee names in the public marketplace reaping proceeds well in excess of $5,000,000.

25.    It was further part of the conspiracy that, during at least on or about April 9, 1998 to at least on or about May 10, 1999, utilizing his nominee entities IRA Group, Inc. and Lexus Partners, Ltd., and bank accounts in those nominee entity names, defendant BERNARD DEUTSCH provided defendant ROBERT P. GORDON with at least approximately $3,085,500 from the proceeds of the above-stated TSIG stock sales. Most, if not all, of those stock fraud proceeds were wire-transferred directly into defendant ROBERT P. GORDON's personal bank account in the state of Florida.

In violation of Title 18, United States Code, Section 1956(h).

## CRIMINAL FORFEITURE ALLEGATION

The United States hereby gives notice to the defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, and THOMAS H. KING that, upon their conviction of the offense charged in Count 2, the Government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), of all property, real and personal, involved in the conspiracy offense in violation of Title 18, United States Code, Section 1956(h), and all property traceable thereto, including but not limited to a sum of money equal to at least approximately $15,141,244 in United States currency, representing the amount of proceeds obtained as a result of the offense, in violation of Title 18, United States Code, § 1956 for which the defendants are jointly and severally liable.

If any of the above-described forfeitable property, as a result of any act or omission of the defendants ROBERT P. GORDON, JOSEPH F. MORGAN, BERNARD DEUTSCH, and THOMAS F. KING:

     a.    cannot be located upon the exercise of due diligence;

     b.    has been transferred or sold to, or deposited with, a third party;

     c.    has been placed beyond the jurisdiction of the court;

     d.    has been substantially diminished in value; or

     e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of defendants ROBERT P. GORDON, JOSEPH F.

MORGAN, BERNARD DEUTSCH, and THOMAS H. KING up to the value of the

forfeitable property described above.

Pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL

FOREPERSON

CHRISTOPHER J. CHRISTIE
United States Attorney

Case No. 2001R0363

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA

v.

ROBERT P. GORDON,
JOSEPH F. MORGAN,
BERNARD DEUTSCH,
THOMAS H. KING, and
ROBERT POZNER

## INDICTMENT

Title 18, United States Code,
Sections 371, 1956(h), 982(a)(1)

A TRUE BILL,

_____
Foreperson

CHRISTOPHER J. CHRISTIE
U.S. ATTORNEY · NEWARK, NEW JERSEY

THOMAS DILEONARDO
ASSISTANT U.S. ATTORNEY
CAMDEN, NEW JERSEY